# E. W. NOAH, Respondent, v. L. B. PRICE MERCAN-TILE COMPANY, a Corporation, Appellant.

Kansas City Court of Appeals, May 23, 1921.

1. **TRIAL PRACTICE:** Continuance: Surprise: Defendant Cannot be Charged with Lack of Diligence in Procuring Testimony of Court Reporter on Surprise by Testimony at Second Trial Differing from Former Testimony and the Error was not Cured by Cross-examination of Witness as to Testimony Given in Deposition. Where defendant makes application for continuance during second trial, based upon surprise at testimony of witness for plaintiff, the witness having sworn at first trial, and in an unsigned deposition, taken two months after occurrence, which deposition he asserted was incorrect, that he did not see defendant's wagon strike plaintiff, and at this trial, four years after alleged occurrence, that he did, *held*, that defendant could not anticipate that witness would change his testimony after having twice testified that he did not see the occurrence, and cannot be charged with lack of diligence for failure to obtain testimony of party who transcribed deposition and of the court reporter at first trial, both being temporarily absent so that they could not be procured as witnesses, and the cross-examination by defendant, of the witness as to his deposition, did not justify the court in denying the application for continuance.

2. **APPEAL AND ERROR:** Continuance, Discretionary: Discretion not Absolute or Arbitrary and Subject to Review if Unsoundly Exercised. The granting of a continuance rests within the sound discretion of the trial court, but it is not an absolute or arbitrary discretion, and is subject to review if the discretion has been unsoundly exercised.

3. ———: ———: Surprise: Where a Party is Surprised by Testimony and has Exercised Due Diligence in Preparation for Trial a Continuance Should be Granted, When to Refuse it Would Work Injustice. A trial court has no right to arbitrarily refuse a continuance to a party to a suit where there has been due diligence in preparing for trial and when it would work injustice or oppression.

4. **CONTINUANCE:** Surprise: Oral Application: Waiver as to Form: An Application Filed by Consent of Plaintiff, the Form Thereof Having been Waived by Plaintiff, and Which Contained All of the

Essential Elements, Held Sufficient. Objection that the action of the court in overruling application for continuance cannot be disturbed because the application was not sufficient, will not be sustained where plaintiff consented that the application might be made orally in open court, and waived motion and affidavit in writing and the oath to application, and the application as a whole contained all the essential elements, pointing out the dif-ference in the testimony of witness since former trial and as given in deposition, and that owing to the temporary absence of stenog-raphers who transcribed the testimony of the witness, it was impossible to obtain the proof to show change in the testimony of the witness, the necessity of such evidence not being anticipated by defendant until the witness claimed his deposition to be in-correct and the change in the testimony, at second trial, from what it had been formerly, and the surprise of defendant by reason thereof, was so clearly stated as to show proper diligence.

5: ———: ———: Where Defendant is Entrapped by Sudden and Un-accountable Change in Testimony of a Witness, it is Entitled to a Postponement of Trial and upon Refusal to Allow Continuance, a New Trial Will be Granted. Where the defendant is suprised and entrapped by the sudden and unaccountable change in the tes-timony of a witness, defendant was entitled to a postponement of the trial in order that it might have a fair opportunity to im-peach the witness by showing that he had changed his testimony in so far as it bore upon the crucial points in plaintiff's case, and upon refusal to allow continuance, a new trial will be granted.

6. DEPOSITIONS: When Used: Surprise: Deposition Taken and Filed by Plaintiff in Former Suit, Admissible to Contradict Con-tention of Plaintiff in Another Case, Even if the Witness is Within the Jurisdiction of the Process of the Court, and Plaintiff Cannot Claim Surprise by its Use. A deposition taken by plaintiff and filed in a former suit, which contradicts the contention of plaintiff at second trial was admissible under section 5467, Revised Statutes 1919, providing that a deposition may be read if the witness re-sides out of the State, the only exception being when the witness is present at the trial, and where deposition shows that the wit-ness is a nonresident of the State, the fact that the witness may have been within the jurisdiction of the process of the court, would not prevent reading deposition, and inasmuch as plaintiff took and filed the deposition in the other case, plaintiff could not have been surprised by its use.

7. INSTRUCTION: An Instruction Which Might Give Jury the Right to Understand that Plaintiff Had a Right to be Where He

Noah v. Price Mercantile Co.

Was When Struck is Erroneous, but the Error is not Reversible in View of Other Instructions.  In an action for personal injuries from being struck by defendant's wagon as it was driven into a barn which told the jury, that if they found, among other things, that plaintiff was sitting in the barn between the north side of the driveway and the office "where he had a right to be" is erroneous as the jury might understand this phrase as being a statement that he had a right to be there, but the instruction does not constitute reversible error inasmuch as it elsewhere required the jury to find that the defendant negligently drove out of the driveway.

8. ———: Measure of Damages: Special Damages: Instruction Should not Allow Finding of Greater Sum of Special Damages than Warranted by Evidence.  An instruction on the measure of damages should not allow the finding of a greater sum of special damages for medical expenses than is warranted by the evidence.

9. APPEAL AND ERROR: Excessive Damage: Question of Excessive Verdict Need Not be Noticed Where New Trial Granted upon Other Grounds.  The question of whether the verdict is excessive need not be noticed in view of a new trial being granted upon other grounds.

Appeal from Circuit Court of Jackson County.—*Hon. Daniel E. Bird,* Judge.

REVERSED AND REMANDED.

*Samuel E. Swiggert, Rollin E. Talbert* and *Rosenberger & Reed* for respondent.

*Ball & Ryland* for appellant.

TRIMBLE, P. J.—Plaintiff, claiming to have been injured through being run over by a wagon negligently driven by defendant's servant while in the prosecution of the master's business, brought suit to recover damages therefor.  In his first action he suffered a nonsuit and thereafter he brought this action, recovering therein a verdict and judgment for $6000 from which the defendant has appealed.

Defendant is in the business of selling merchandise at retail throughout Kansas City, and perhaps adjacent towns, by means of solicitors who canvass from house to house working under foremen who are each in charge of a group of solicitors. Each of these foremen is furnished with a wagon and horse by which the goods to be sold are hauled by the foreman to the locality intended to be canvassed, and there the goods are distributed to the solicitors of that group who thereupon proceed to canvass that locality, make sales and account to the foremen therefor.

, Defendant kept its horses at a livery barn in Kansas City. It was a two-story structure 70 feet wide north and south, and 50 feet deep east and west, and faced west on an alley 15 feet wide running north and south. The barn office, 12 feet square, was in the northwest corner of the barn, and the north side of the barn entrance, 12 feet wide, was 7 feet south of the south side of the barn office. A driveway, 12 feet wide, ran from the entrance east, apparently the full depth of the barn. This driveway had no partitions marking its boundaries, they being merely imaginary lines, and the driveway was, therefore, merely a 12-foot space used in driving vehicles into the barn.

Customarily, a number of chairs stood in the seven-foot space between the driveway and the office, and here those about the barn were accustomed to sit when not engaged in their work.

Plaintiff was one of defendant's solicitors who worked under a foreman named Woods. As he was on a commission he worked when he chose, and on the day of the alleged injury he was not working but had come to the barn to tell his foreman that he had been absent on account of his brother's death. It was while seated in one of the chairs in the 7-foot space above referred to, waiting to see his foreman, that plaintiff claims to have received the alleged injury sometime about noon of August 5, 1916.

Plaintiff's evidence, as to the occurrence of the injury, consisted of his testimony and that of a man by the name of McBreen, a saloon keeper; and according to their evidence, the facts are as follows:

Plaintiff was seated about *halfway between* the office and the driveway at a point nearly opposite but perhaps slightly east of the door in the south side of the office not far from the southeast corner thereof. He had been sitting there about 15 minutes, with his back to the north and his face to the south, talking to a negro who was sitting in a chair a foot-and-a-half or two feet west of him, when McBreen, in a single buggy with an attractive horse, drove into the barn and east along the driveway until the rear of his buggy was from 12 to 16 feet east of the entrance. McBreen got out of the buggy and began unhitching the horse from the south side thereof. Plaintiff, attracted by the horse, sat with his face to the southeast looking at him. While in this position, Himan a foreman of defendant, and in charge of one of its wagons, drove rapidly into the barn and driveway, but instead of keeping the horse and wagon confined thereto they were allowed to veer out of the driveway to the north until they struck and ran over plaintiff and then the horse and vehicle curved back southeast into the driveway again, striking the buggy standing there, and at this point the horse was caught by Roll, the proprietor of the stable, who was helping McBreen unhitch. As the horse and wagon made this curved course out of the driveway the wagon struck the negro and plaintiff, turning them in their chairs over on the cement floor, the negro falling upon plaintiff and the left wheel of the wagon passin over plaintiff's leg, injuring his shin, and bruising him in various places about the body.

Plaintiff says he did not see the horse and wagon enter the barn, as his attention was fixed on the McBreen horse. He says the first thing he knew he was knocked over, the negro was thrown on top of him and he was run over. He says he saw the wheels as it ran over his

leg and the horse was going at that time "pretty fast" and that the horse and wagon continued on for 15 or 16 feet past him.

Plaintiff's evidence, as to the entrance of the wagon into the barn and what occurred just before and at the moment plaintiff was struck, was given by McBreen. He testified that his buggy had been driven along the driveway until its rear end was 14 or 15 feet east of the entrance, that his own horse was about 20 feet east of the entrance and about 5 feet south of the center of the driveway, and his buggy was south of the center of the driveway; that he was standing on the south side of his horse, helping to unhitch it, and was about 18 to 20 feet east of the entrance when Himan drove in "awfully fast because I heard a noise and I just happened to look around and saw the horse coming in pretty fast." "It looked as though he was coming in at a trot." McBreen also said that as the horse came in, the driver was not guiding him aright, the horse's head was turned to the north over toward the office instead of straight east along the driveway; that he heard "some of the boys" holler and he looked around, and plaintiff and the negro were knocked over by the wagon, the chairs were upset, the two men were on the floor, and they and the chairs were all "mixed up there and scrambled;" that the horse, after passing plaintiff, continued east and south until he reached a point near the south side of the driveway close to his buggy where it stopped, the end of a shaft knocking a piece of the rubber out of the tire on the hind wheel of witness's buggy.

McBreen further testified that he heard the holler and looked around *before* the accident, and *saw what occurred;* that, judging from the way the horse entered the barn, Himan must have driven up the alley from the south; that the hollering *began before the horse came into the barn,* and when he looked around, the horse and vehicle were coming into the barn faster than they ought and completely out of their direction; that part of the

horse was in the barn and the wagon was still in the alley
when he looked around; that he saw the wagon come in
the door and saw it strike the negro and plaintiff; that
while his horse was between him and them he could
easily see over the horse, and when he heard the racket
he quit unhitching and looked around; that as he drove
into the barn himself he had no difficulty whatever in
going along the driveway past the plaintiff and the negro
sitting where they were and that he noticed plaintiff sit-
ting there as he drove in. He denied positively having
testified on the former trial that he did not see the wagon
hit plaintiff or anybody and did not know anything about
it until after the alleged occurrence.

There was also evidence on the part of both plain-
tiff and McBreen that Himan, upon reaching the point
in the alley where he turned to come into the barn, had a
clear view of, and could easily have seen, plaintiff where
he sat for a distance of 35 or 40 feet before reaching
him and that he could easily have stopped the horse in
5 or 6 feet. Plaintiff denied that he was intoxicated at
the time and McBreen says he saw nothing to indicate
that he was.

These two witnesses, plaintiff and McBreen, were all
that testified for the plaintiff concerning the matters
surrounding the infliction of the injury, and after a
medical witness had testified as to the nature and extent
of the injuries, plaintiff rested.

Thereupon defendant presented an application for
a continuance based on surprise at McBreen's testimony
at the present trial and the change therein from what
it was at the first trial and in his deposition taken before
that. The plaintiff waived the necessity of reducing the
application to writing and also the making of the affi-
davit thereto, and upon said waiver the application was
made orally. Inasmuch as it will be better to here set
forth defendant's evidence and contention as to what
happened at the barn, in contrast to what plaintiff con-
tends happened, we will not go further into the appli-

cation at this time except to say that, upon plaintiff's objection that McBreen's testimony at this trial was *substantially the same as before* and that defendant had shown *no diligence,* the court overruled the application for continuance, the defendant excepting.

Upon the commencement of defendant's testimony, the plaintiff for the first time asked to have the witnesses put under the rule and, over the objections of defendant, this was done.

Thereupon Himan testified that he, in company with Klein on the seat beside him, drove the horse into the barn *in a walk;* that one cannot see into the interior of the barn till he gets in the doorway; that he saw plaintiff seated in a chair a few feet directly east of the door on the north side of the door line, sitting *right close up* to the north line of the driveway; that he stopped in the entrance until the rig ahead of him could get out of the way and Klein spoke to plaintiff and then witness drove on in going east along the driveway and not getting over the north line thereof; that as he started to go into the barn plaintiff, who was sitting *right close up to the line,* started to get up and pull his chair back, he was sitting right close to the side of the horse as it passed him, and the plaintiff, as he started to pull his chair back, fell over it, whether the chair fell or plaintiff slipped at the time, he wasn't positive. Witness was looking and driving straight ahead but could not help but see plaintiff fall as the latter was then at the side of the wagon, witness being on the right hand side of the seat and Klein on the left next to plaintiff; that he did not know plaintiff was hurt, that he saw him sprawled out on the floor but he got up immediately; that he is positive the wagon did not run over plaintiff's leg, that there was no jolt and he did not know plaintiff was struck and plaintiff made no claim that he was struck but did at the office show his leg and said it was lucky he was not hurt very much; that the men were sitting further to the south than they usually sat; that he saw

plaintiff in backing his chair from the wagon, as he was sitting pretty close, fall out of his chair, his head to the north and he was pretty tall; that the negro never moved, never fell out of his chair but sat still; that the horse went two or three feet and stopped; that the men were sitting too close to the driveway, closer than any one usually sat; that if plaintiff was struck at all it was because, in trying to get further back he fell out of the chair and stretched his legs out until they came in contact with the wheel, which was his fault, as the wagon would not have hit him; that the horse was 20 years old and quiet and under control; that plaintiff was intoxicated; that it would have been impossible for the horse to have taken any such course as plaintiff says it did, or for the wagon to have struck plaintiff seated where he claims he was, because of the posts.

Roll, the proprietor, testified that the plaintiff was sitting right along the driveway, could not say exactly where, but closer to the line of the driveway than the office; that when McBreen came in, he, the witness, started to help him to unhitch and just then Himan came in with his wagon, and, in order to make room for him, witness took hold of McBreen's horse and the buggy shaft and pulled them forward a little to allow Himan room to come in; that when he did this Himan who had stopped in the entrance came in, the horse proceeding in a walk. Witness had hold of McBreen's horse when he heard a chair turn over but this was out of witness's sight, owing to the horse; that he did not know whether the wagon struck anything or not as he was where he could not see; that Himan came to a stop at the door and then came on in a walk, the horse stopping the second time of its own accord, and that he did not catch him; that the horse was headed due east as he came in. His statement that he did not think the horse and wagon got out of the limits of the driveway, was stricken out as a conclusion, whereupon he said he could not say whether they did or not, it would depend on what were

considered the limits; that plaintiff was intoxicated. On cross-examination he was asked if he would say plaintiff and the colored boy were about half-way between the north line of the driveway and the office, and answered " yes;" that he didn't see what overturned plaintiff's chair as he could not see it from where he was; that he didn't see plaintiff on the floor at all, as he had gotten up before he got around there; that plaintiff " sort of laughed it off;" that he didn't seem to be hurt at all;" but this was stricken out as a conclusion; that the plaintiff's trousers were torn a little above the bottom and plaintiff went away and came back saying he was " going to get a new pair of trousers for that anyway."

Klein testified that he was on the wagon with Himan, sitting to the left of the latter; that when they drove into the barn entrance they stopped and plaintiff was sitting very close to the horse and wagon; that witness spoke to him; that he had known plaintiff for a long time and plaintiff was drinking "pretty heavy," he could hardly stand up; that when the McBreen horse was out of the way they went ahead and the plaintiff "went to move his rocking-chair and he fell and went against the left wheel; that the wagon did not strike his chair nor knock it over; nor was the negro's chair struck nor did he fall; that Himan's horse took no such course as plaintiff said it did; that it was impossible because of the posts that were there; that plaintiff got up out of his chair, but being drunk, fell back over it.

Thus it is seen that the issue of whether plaintiff was struck and injured by the wagon through the negligence of defendant's driver or whether he fell and in the fall stuck his leg out in the way of the wagon as it came by and was hurt through his own negligence, depends upon evidence that covers a very small and narrow compass, namely, as to what occurred as Himan drove in and at the moment he passed plaintiff. The nub of the case lies in this narrow limit.

Wherever plaintiff was seated in the 7-foot space, the alleged injury *could* have happened as the defendant's witnesses claim, since it is conceded that plaintiff is over six feet tall, and if he was intoxicated as they say he was, and fell and sprawled out on the floor in an effort to get out of his chair, his foot and shin could have struck against the wagon wheel as they claim it did through no fault of defendant's driver. And as plaintiff did not see the wagon come into the barn, McBreen's testimony as to what occurred before the injury and as to *how it happened* is a very important and pivotal matter in the case.

In the cross-examination of McBreen he admitted that on October 26, 1916, a little over *two months* after the alleged injury (the second trial was had nearly *four years* thereafter), the plaintiff took his deposition, which was before the first trial; that he announced before he was examined, that, regardless of the correctness with which it was written up, he would not sign any deposition that he gave. He also said, in cross-examination at the present trial, that he understood when the deposition was taken that the plaintiff was taking it and had a right to take his deposition as one of the witnesses to the occurrence. He could give no reason at the trial for having thus refused, before the deposition was taken, to sign any that might be taken, but said: "I just had an idea I would not sign any papers in regard to the case, that is all." "I don't know exactly why. I took a notion I would not sign my name on it." He further said, in cross-examination, that his testimony in the deposition was taken down in shorthand and that he never signed the deposition.

This unsigned deposition, which was filed in the first suit, was then presented to him and he was cross-examined in regard thereto. According to the deposition, McBreen testified as to matters in general pretty much as he did in the present trial, but as to certain *vitally* important matters his testimony was *wholly different,*

and in no way can it be said his testimony is substantially the same, as plaintiff claims.

In the deposition the witness said the *first thing* that attracted his attention to anything unusual was that he heard some one holler, he thought it was Roll who was helping unhitch; that witness was *facing south* (instead of north as he now claims), and had his *back turned* and he looked around and saw the horse coming in, that the horse when he *first saw* him was on the north side of the driveway where he, the witness, was, and Mr. Roll had the horse by the head, and the horse had stopped; that he *did not see* the wagon run over plaintiff or over anything, or strike plaintiff; that he did not see plaintiff or the negro until after the incident was over; that plaintiff had his pants torn but he did not see his injured leg that day but did afterwards; that when he, McBreen, drove into the barn he saw two or three fellows sitting there but didn't notice the plaintiff; that he had no difficulty in driving in. When asked if any one was sitting out in the driveway, he replied "Well I drove in all right;" and when asked where the sitting men were with reference to the north line of the driveway, he said "they were on the north side, *how far I could not say.*" He said several times he had his back turned to the men when Himan drove in and could therefore give no evidence as to how the incident occurred.

But McBreen positively denied having thus testified at the taking of his deposition or at the first trial, and said he had at both times testified as he did at this last trial, and asserted that his testimony given at the taking of the deposition, was not taken down or reported correctly by Diffendorfer, the notary and shorthand reporter thereof, with whom, however, he was not acquainted and whose name he did not know.

In the first suit between the parties, the plaintiff took, and filed therein, the deposition of W. S. Buck who, at the time of the alleged injury, was the defendant's general manage. At the time of the second trial, how-

ever, plaintiff was working in Lincoln, Nebraska, for Buck who had gone into the mercantile business for himself. Defendant offered in evidence the deposition thus taken by plaintiff and filed in the former suit. Plaintiff objected to the defendant using the deposition on the ground that Buck was in the city and available. Plaintiff's counsel in making the objection said he was "reliably informed" Buck was in the city, and that he knew he was because counsel had called his office over the telephone. The court ruled that the deposition would not be admissible unless defendant made a showing that Buck was not in the city, and upon ascertaining that defendant had not had Buck subpoenaed, sustained the objection to the deposition, the defendant excepting.

In the deposition, Buck testified that plaintiff came to the defendant's office shortly after noon on the day of the injury; that one of his trousers' legs was torn, a slit about 3 or 4 inches long about an inch from the bottom; that plaintiff limped some; that he showed witness "a black-and-blue place" on his leg about 3 or 4 inches above the ankle joint, the skin of which was not broken but it looked like drops of water were oozing through; that he mentioned no other injuries and said something about having been run over by somebody down at the barn; that the bruised place had not been dressed yet, and that he made no complaint of any pain or suffering from it, and was able to get about though he was "pretty drunk," "so drunk he could hardly stand."

Defendant also offered in evidence the petition filed by plaintiff in the former case "for the purpose of showing what was then said about the ground of recovery and showing the difference between the petition in this suit" and as an admission or statement of what was originally stated by this plaintiff in his pleading and as different and distinct from what he now states in his pleading. The plaintiff objected on the ground that the petition was wholly irrelevant, incompetent and immaterial to any issue in the case, and the court sustained

208 M. A.—11

the objection.   Counsel for defendant urged its admissibility because its statements bore on the "credibility of the plaintiff's present story."   To this the court replied that plaintiff had a right to file a new petition and, sustaining the objection, excluded the petition.   The defendant then offered the record of the court showing the former nonsuit as some evidence tending to show that McBreen had not testified at that trial as he had in this one, but the court refused to admit it in evidence.

The evidence of plaintiff's medical witness as to his injuries was that plaintiff came to him along in the afternoon, that he had marks and bruises on his hip, and back and left leg between the knee and ankle; that there was not much visible signs of injury outside of the bruise on his leg; that nothing else required treatment and he gave none except to the leg; that as to that the leg was red, swollen and painful; that the outside layer of skin had been rubbed off but it was not cut, the blood was exuding through the skin, not running but coming through the pores; that he continued to treat it for two months, and for a time it got worse, it swelled and a tumor or pus formed which fluctuated; that when he ceased treating him the place was not cured, there was some inflammation and pain there; that the periosteum or covering of the bone was injured; that the last time he examined him was about a week before the last trial; that the leg looked like anybody's legs now except that one of the muscles was not attached to the ankle; that the result of the long continued inflammation caused a scar to come in the covering of the bone through which scar the blood cannot circulate freely, so that nourishment is impaired and as the nerves are constricted there it gives rise to tenderness and pain when the leg is pressed at that point; that the leg is weaker than the other and the condition is permanent.

The first point made by appellant is that the court should have granted a continuance on the ground of surprise at the testimony of the witness McBreen.   As hereinbefore stated and shown, the vital part of the evidence

as to defendant's liability is concentrated in that which has to do with the coming of Himan into the barn and what occurred at the moment he passed plaintiff. The latter admits he did not see Himan come into the barn and tht first thing he knew he was knocked over. The evidence of McBreen that he saw the whole thing is, therefore, the very heart and vitals of plaintiff's case. It is the only evidence plaintiff has from an apparently disinterested souce as to what did occur at the crucial point. Consequently its importance cannot be overestimated. But, in the vital particulars above noted, McBreen's evidence at the second trial (four years after the occurrence) is directly contrary to that which manifestly appears to have been his evidence in his deposition taken a little over two months after the alleged injury occurred, and to that given by him at the former trial. There is no explanation on his part as to any change. He merely denies that there is any change, and boldly asserts that his testimony was not correctly taken down. It will not do to say that his testimony is *substantially* the same because clearly it is not. The motion for a continuance asserts that he testified at the former trial the same as he did at his deposition. For the purpose of passing on the propriety of the continuance, this must be accepted as true; besides, it is not conceivable that there could have been an enforced nonsuit if he had testified in the former trial as he did at the last. Clearly, defendant could not *anticipate* that McBreen would change his testimony after having *twice* testified that he did not see the occurrence nor what preceded it. Consequently defendant ought not to be charged with a *lack of diligence* in not being prepared to meet his bold assertion that he testified the same way before. Nor will it meet the situation to say that McBreen was cross-examined upon the deposition and that, plaintiff not objecting, the deposition was introduced in evidence by defendant, and therefore it got the benefit thereof. The trouble is McBreen swore that the deposition *did not correctly* contain his testimony and, owing to the *temporary*

absence of the shorthand man and notary, Diffendoffer, and of the stenographer of Division No. 1 of the Circuit Court of Jackson county wherein the first trial was had, defendant was thus caught, unexpectedly and through no fault on its part, without means of obtaining affirmative and competent proof of exactly what McBreen did testify to on those two former occasions, and had no means of impeaching him in the most effective way possible by showing, by the men who took his evidence down, that he testified differently on said occasions. The contention that defendant has shown a lack of diligence because it did not procure a transcript of McBreen's testimony on the former trial, and did not obtain Diffendoffer's deposition as to what McBreen testified to in his deposition, is without merit, since there was no reason to anticipate that McBreen, after having twice testified that he did not see the occurrence, would face about and swear that he did see it. Besides, as to his testimony at the former trial, what good would a transcript of that have done? Defendant had the deposition, taken at the instance of plaintiff and by a notary of his selection, but McBreen nullifies it by coolly saying his testimony was not correctly reported. It would seem that under the circumstances, defendant could rightfully claim to be surprised. It was thus caught without the means of combating the strange and starling change of front on the part of this witness. "Surprise in its legal acceptation, it is said, denotes an unforeseen disappointment in some reasonable expectation against which ordinary prudence would not have afforded protection." [Peers v. Davis, Admrs., 29 Mo. 184, 190; Fretwell v. Laffon, 77 Mo. 26.] "Where there is a clear case of surprise and the party complaining is wholly free from negligence, so that without the interposition of the court injustice would be done, a continuance should be granted or a new trial awarded." [Gidionson v. Union Depot R. Co., 129 Mo. 392, 400.] And surprise is one of the statutory grounds for granting a new trial. [Sec. 1453, R. S. 1919.] "The general rule is that when a party or his

counsel is taken by surprise, in a material point or circumstance which could not have been anticipated, and when want of skill, care or attention cannot be justly imputed, and injustice has been done, a new trial should be granted.'' [3 Bouvier 3210.] In practice, surprise is the ''situation in which a party is unexpectedly placed, without any fault of his own, which will be injurious to his interest.'' [37 Cyc. 15.] In Withers v. State, 5 S. W. 121, defendant claimed surprise and asked for a continuance because a witness testified directly contrary to what he had sworn to on a former trial, and it was held that the court erred in refusing the continuance. There is no question but that the granting of a continuance rests within the sound discretion of the trial court, but it is not an absolute or arbitrary discretion; it is one that is subject to review if the discretion has been unsoundly exercised. ''A trial court has no right to arbitrarily refuse a continuance to a party to a suit where there has been due diligence in preparing for trial and when it would work injustice or oppression. [Laun v. Ponath, 105 Mo. App. 203, 206 and cases cited.]

It is urged by plaintiff that the action of the court in overruling the continuance cannot be disturbed because the application was not sufficient. It was, however, not overruled on this ground but because of a lack of diligence. Plaintiff consented that the application might be made orally in open court and waived motion and affidavit in writing and further waived oath to the application. It is not, therefore, the formal written application called for in the statute. But, taking it as a whole, it contains all the essential elements of a good application. It is manifest from the oral motion that the difference in McBreen's testimony was clearly pointed out and that owing to the temporary absence of Diffendoffer, who took and transcribed the deposition, and of the official stenographer in Division No. 1, defendant could not meet the change in McBreen's testimony and that it was impossible to obtain proof to show that fact. The name of

the official stenographer was not mentioned, but the man himself was designated as well as the position he held in an adjoining and coordinate branch of the court and the particular number of the division was given, together with the fact that his substitute, acting in his temporary absence, could not read his notes, was fully stated. The necessity of the presence of the witnesses was not dreamed of until McBreen testified as he did, and the importance and imperative need of getting the proof and the *temporary* impossibility of doing so, was all so clearly stated, together with defendant's surprise at the evidence Mc-Breen gave, that it manifestly appeared that the witnesses were "not absent by the connivance or consent of the defendant, and that the application was not made for vexation of delay," even though those particular words were not used by defendant in moving for the continuance.

We think that under the circumstances of this case defendant was surprised and entrapped by the sudden and unaccountable change in the testimony of the witness; that, in view of the situation, defendant was entitled to a postponement of the trial in order that it might have a fair opportunity to impeach the witness by showing that he had changed his testimony in-so-far as it bore upon the crucial points in plaintiff's case. Hence, we entertain the view that a new trial should be granted.

As, in our view, the judgment should be reversed and a new trial granted, it becomes unnecessary to pass upon the question whether there was reversible error in excluding the deposition of Buck and plaintiff's petition in the other case. So far as the latter is concerned, it was admissable for one reason at least as it alleged that "the entrance into said barn was obstructed by other horses and vehicles" when in the present case plaintiff contended that McBreen's horse and buggy was so far inside as to constitute no obstruction and that defendant's driver did not stop his horse at the entrance because there was a horse and buggy in the way. As the case is to be retried

we need not say whether this error was cured by plaintiff's belated waiver of objections to the introduction of the petition on a later day and after defendant had closed its case, upon which waiver no action was taken by the court which had theretofore ruled that the petition was *not evidence*. Buck's deposition, taken by the adverse party and filed in the other case, certainly contained important evidence in defendant's behalf. At the time the deposition was taken, Buck was *defendant's* general manager, but at the time of the trial he was *plaintiff's* employer. He was not present in court, and the deposition itself showed that he resided in Kansas. Section 5467, Revised Statutes 1919, provides that a deposition may be read if the witness resides out of the State and this fact may be established by the deposing witness. [Michael v. Mathis, 77 Mo. App. 556, 561.] The only exception is when the witness is present at the trial. "The fact that this witness may have been within the jurisdiction of the process of the court at the time of the trial, did not prevent the reading of the deposition." [Benjamin v. Metropolitan St. Ry., 133 Mo. 274, 287.] The deposition was taken by plaintiff in the former suit. The *other party* sought to use it in the second trial, but did not file it in this case nor give notice of intention to use it. A deposition taken and filed in a cause is common property and either is entitled to use it if otherwise competent. [Watson v. Race, 46 Mo. App. 546, 562.] In Samuel v. Withers, 16 Mo. 532, there were two depositions of Bristow taken by defendant, one in a former suit and the other in the trial of the reported action. Witness himself introduced in evidence the deposition taken in the former suit. The court held that "under the circumstances of this case" it was error to admit the deposition as it was not filed in the second suit nor notice given of intention to use it. In Cabanne v. Walker, 31 Mo. 274, it was held that this rule is dispensed with when the ends of justice require it. And in Parsons v. Parsons, 45 Mo. 265, 267, the court, after mentioning the rule,

cites Samuel v. Withers, 16 Mo. 532, and then says: "See, however, Cabanne v. Walker, 31 Mo. 214," (274). In Adams v. Raigner, 69 Mo. 363, 364, the deposition taken in a former case was held admissible even though not filed in the case tried and even though notice was not given, the rule not being "considered indispensable" where no surprise would result. Inasmuch as *plaintiff* took and filed the deposition in the other case, we do not see how he could have been surprised by its use. However, upon a retrial of the case all question as to its admissibility can be removed by refiling it in this case.

Plaintiff's instruction A ought not to have told the jury that if they found, among other things, that plaintiff was sitting in the barn between the north side of the driveway and the office "where he had a right to be" since, regardless of the question whether this does not submit a question of law to the jury, it is not altogether certain that a jury might not understand this phrase as being a statement of the court that he had a right to be there. The instruction comes very near evading the issue as to just where plaintiff sat. Plaintiff says he sat *half way* between the office and the line of the driveway. Defendant says he sat *very close* to that line, too close in fact. Now, he could do this and yet be sitting *between* the two. However, we will not say the instruction constitutes *reversible* error inasmuch as it elsewhere required the jury to find that the defendant negligently drove out of the driveway, though, as there were no boundaries for the driveway they being mere imaginary lines, it might be difficult to say whether it was negligent to get a half inch or so over the line which nevertheless might be considered as out of the driveway. It seems that it would be better to have submitted the question whether plaintiff was sitting in the space above mentioned a sufficient distance away from the driveway to be reasonably safe from passing vehicles in the driveway.

The instruction on the measure of damages should not allow the finding of a greater sum of special damages for medical expense than is warranted by the evidence. The evidence showed $150 while the instruction allowed the jury to find on that item "not exceeding $500."

The question of whether the verdict is excessive need not be noticed in view of a new trial being awarded for the reason and upon the ground herein above stated.

The judgment is reversed and the cause remanded for a new trial. All concur.